UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PEAKER ENERGY GROUP, LLC & ENERGY COAST LOGISTICS TERMINAL, LLC | CIVIL ACTION |
| VERSUS | NO.  14-2106 |
| CARGILL, INCORPORATED & LOUISIANA SUGAR REFINING, LLC | SECTION  "N"  (3) |

### ORDER AND REASONS

Presently before the Court are motions to dismiss filed by Defendants Cargill, Inc. and Louisiana Sugar Refining, LLC, pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure. Having carefully considered the parties' supporting and opposing submissions, and applicable law, **IT IS ORDERED** that Defendants' motions (Rec. Docs. 6 and 8) are **GRANTED IN PART** and **DENIED IN PART** as stated herein.

To the extent that Defendants' motions are granted, **IT IS FURTHER ORDERED** that these rulings are without prejudice to Plaintiffs' right to attempt to cure the identified deficiencies by amendment filed no later twenty (20) days from the entry of this Order and Reasons. Any such amendment is to be set forth in a second amended and superseding complaint. The second amended and superseding complaint must include all of the allegations from Plaintiffs' first amended complaint (Rec. Doc. 4) on which they continue to rely, as well as their amended and added allegations, such that the case can proceed on the basis of the second amended and superseding complaint without requiring further reference to prior pleadings.  Should Plaintiffs fail to timely

1

make the necessary amendment, the Court shall, upon properly supported motion by the Defendants, order that the affected claims be dismissed with prejudice.

## BACKGROUND

Louisiana Sugar Refining, LLC ("LSR"), a joint venture between Defendant Cargill, Inc. ("Cargill") and Sugar Growers and Refiners, Inc. ("SUGAR"), operates a white sugar refinery in Gramercy, Louisiana.[1]  Cargill and SUGAR each possess a 50 percent interest in the sugar refinery.  SUGAR is a cooperative association.  Plaintiffs, Peaker Energy Group., LLC ("Peaker") and Energy Coast Logistics Terminal, LLC ("ECLT"), characterize Cargill as a privately held business with worldwide operations in a variety of markets, including agriculture commodity trading and processing, food ingredients and applications, farmer services, animal feed and nutrition, energy and industrial services, and financial services.[2]

Plaintiff Peaker describes itself as having special expertise in rail and shipping terminals for crude oil, biofuels, natural gas liquids, and refined products, and Peaker, its agents, and consultants have used that expertise to develop, design, and manage such terminals throughout North America.  Because LSR's facility enjoys important connections to both water and rail shipping, has an existing dock, is in close proximity to oil refineries, and is adjacent to farm land suitable for industrial development, Peaker devised a plan, referred to by Plaintiffs as the "Project," premised upon using LSR's terminal site as a distribution point for crude oil, refined products, natural gas liquids and biofuels.  Peaker's sole member, Matthew Goitia, formed a limited liability company,

---

[1]    LSR is a Delaware limited liability company.  Its principal place of business is in Louisiana.  See Amended Complaint, Rec. Doc. 4, ¶ 4.

[2]    Cargill was incorporated in a Delaware,  is registered to do business in Louisiana, and has its principal place of business in Minnesota.  Id. at  ¶ 3.

2

Plaintiff ECLT, to execute that plan.

Seeking to move forward with the Project, Plaintiffs then approached LSR, on August 13, 2013, to propose that Plaintiffs lease certain assets at LSR's facility (referred to by Plaintiffs as the "Terminal Site"), including LSR's dock, and be allowed to utilize LSR's rail connections, in return for LSR's receipt of certain fees and certain upgrades of its infrastructure.  According to Plaintiffs, the proposal to LSR included the execution of the Project at LSR's Terminal Site through ECLT.

In support of their claims, Plaintiffs also allege the following relative to the Project and their dealings with Defendants LSR and Cargill:

Plaintiffs' business plan for the Project was an extremely valuable asset – as conceived, the Project was valued at nearly $1 billion. In order to ensure that the very valuable proprietary business plan for the Project would remain confidential, Peaker and LSR entered into a Non-Disclosure Agreement ("NDA"), entitled "Confidentiality Agreement – Site Business Development," dated August 20, 2013 (herein, "LSR NDA"), which was initially drafted and presented by LSR.

The LSR NDA was intended to protect Plaintiffs from having their prospective business partner, LSR, usurp the Project or Plaintiffs' plans for the Project, and to prevent LSR from sharing with any third parties confidential information relating to the Project.  The LSR NDA specifically precluded LSR from any "attempt in any manner to contact or deal with any . . . individuals or companies identified in the confidential information in connection with or related to the project or business plan proposed by the company [Peaker]" and from acting to "by-pass, compete, avoid, circumvent, or attempt to circumvent the company [Peaker] relative to the proposed project . . . ." Thus, the LSR NDA created an obligation in perpetuity on LSR's part not to disclose the plans for the Project or use those plans to arrogate the Project to itself.

After Peaker and LSR executed the LSR NDA, between August 2013 and January 2014, Plaintiffs and LSR engaged in detailed discussions about the Project and conducted numerous meetings with each other to further the Project. [] Between August 2013 and January 2014, on numerous occasions and with LSR's full knowledge and cooperation (and at Plaintiffs' expense), Plaintiffs and their agents, consultants, and/or contracted third parties traveled to the Terminal Site, where they performed activities in support and development of the Project [and explained to LSR their business plan and the contemplated infrastructure changes.] Throughout

that period, LSR expressed enthusiasm for the Project and reassured Plaintiffs that the Project would go forward once LSR and Plaintiffs finalized the terms of the agreement to effectuate the Project (the "Deal").  Further, on several occasions, LSR stated that it had obtained board approval for the Project and all that remained for the Project to be finalized was to present an agreement acceptable to LSR's Chief Executive Officer and General Manager, Larry Faucheux.

Plaintiffs and LSR worked together to finalize the terms of the Deal, exchanging at least five rounds of term sheets for the Deal between October 20, 2013 and December 9, 2013.   LSR's executives represented that they had been working with local community leaders,  politicians, and landowners to advance the Project; thus, LSR became deeply involved in the joint effort between Plaintiffs and LSR to bring the Project to fruition. LSR represented to Plaintiffs that it either possessed title, or had options that ensured its ability to acquire title, to adjacent lands that fell within the Project's proposed footprint. Subsequently, Plaintiffs learned that LSR misrepresented its rights to the lands and their title."  [Additionally,] Plaintiffs hired engineering firms and coordinated with LSR to plan surveys of the site where the proposed terminal would be located.  Plaintiffs [also] provided LSR with a detailed bullet-point summary of the survey requirements and attached sketches for the site that Peaker's rail and engineering teams had prepared.

* * *

While negotiating with LSR, Plaintiffs – expending the combined reputational capital and acquired goodwill that their agents and consultants had built up in the energy industry through many years  –  worked steadily towards securing the other aspects and requirements of the Project such as acquiring the proper permits and licenses, obtaining financial backing, and soliciting customers. In sum, LSR worked jointly with Plaintiffs towards development and realization of the Project, and throughout that process indicated to Plaintiffs that finalizing the terms of the Dealwould be a mere formality.

Just prior to reaching agreement with LSR on the terms for the deal, Plaintiffs arranged a meeting with Cargill, [which] had been suggested to Plaintiffs as a potential customer for the Project because of Cargill's interest in the energy industry through its Energy, Transportation, Metals division.  On or about December 31, 2013, Goitia spoke by telephone with Gaston Garrido, Cargille's ETM business development manager, and presented a highly generalized description of the Project. During that conversation, Goitia mentioned that Cargill was a one-half owner of the LSR site – a fact that Garrido did not know.

On January 2, 2014, Goitia and Garrido met, at which time Goitia made a detailed presentation of the Project. Again, Garrido expressed surprise that Cargill had not heard about the Project before, given Cargill's one-half interest in LSR.  At that time, Garrido also disclosed to Goitia that Cargill had been trying unsuccessfully

4

to develop a project similar to Plaintiffs at the site of another Cargill asset several miles down the Mississippi River from the LSR site.  At that January 2, 2014 meeting, Goitia also disclosed to Garrido the existence of the LSR NDA. Upon learning of the LSR NDA, Garrido admitted that Cargill would be bound to work with Plaintiffs on the Project as a result of that document. Cargill also expressed interest in becoming an equity partner in the Project. As the meeting concluded, Garrido indicated that his next step would be to introduce the Project idea to a bigger group within Cargill.

Shortly after leaving the meeting with Cargill, Goitia received a telephone call from Scott MacKenzie ("MacKenzie"), LSR's Business Development Consultant, requesting a meeting, and expressly asking him to come alone. On January 3, 2014, Goitia met with Faucheux and MacKenzie. The principal topic discussed was the Deal.  And at that time, Goitia, Faucheux, and MacKenzie reached a verbal agreement on the Deal, which agreement incorporated and built upon the most recent term sheet that they had exchanged.  Also at the January 3, 2014 meeting, Goitia told Faucheux and MacKenzie that he had met with representatives of Cargill. MacKenzie mentioned that LSR had conducted discussions with other transload companies, which prompted Goitia to remind him that such discussions constituted a violation of the terms of the LSR NDA. By the time Plaintiffs reached agreement on the terms for the Deal with LSR, Plaintiffs had secured BBVA Compass Bank to arrange the equity and debt aspects of the Project and had secured numerous customer commitments, including one major refinery which had committed to a five-year deal for 10,000 barrels of crude oil per day to be processed through the terminal Project.

After the January 3, 2014 meeting, MacKenzie sent Goitia a project evaluation form, which according to MacKenzie had to be completed on all co-located opportunities at Cargill properties, and asked that Goitia complete the form. The completed form was returned to MacKenzie by January 6, 2014.

[] On January 7, 2014, Goitia again met with Garrido, at which time Cargill again expressed interest in participating in Plaintiffs' Project as a joint venture and requested additional data on the Project, including financial and engineering models. At the January 7, 2014 meeting, Goita informed Garrido that Plaintiffs and LSR had reached an agreement on the Deal at the meeting between Goitia, MacKenzie and Faucheux on January 3, 2014, and reminded Cargill about the LSR NDA and also requested that Cargill execute a similar agreement. After the January 7, 2014 meeting, Cargill sent Peaker a proposed NDA, which Peaker reviewed, edited, and returned with its comments to Cargill on January 8, 2014.  On January 8, 2014, Goitia sent an email to Faucheux and MacKenzie, again reminding them of the obligations contained in the LSR NDA.

All dealings up to this point had been amicable and positive, and LSR had repeatedly assured Plaintiffs that the Deal for the Project would be consummated.

5

Indeed, LSR and Plaintiffs had agreed to terms for the Deal at their January 3, 2014 meeting. But once the details of the Project became known within Cargill, LSR, of which Cargill holds a one-half interest, began to back away from its previous commitments to Plaintiffs.

[Specifically, on] January 9, 2014, Goitia received a frantic telephone call from Faucheux and MacKenzie, expressing shock and concern that Goitia had discussed the Project with Cargill, despite Goitia having informed Faucheux and MacKenzie of those discussions during the meeting that occurred at LSR on January 3, 2014. In that January 9, 2014 telephone call, Faucheux and MacKenzie expressed panicked concern for their jobs and told Goitia that Peaker must step aside so that Cargill could take on the Project at the LSR site instead of Plaintiffs and without Plaintiffs' involvement. Because LSR and Plaintiffs had come to an agreement during their January 3, 2014 meeting, Goitia informed Faucheux and MacKenzie that he intended to continue with the Deal as agreed with LSR.

Shortly after that January 9, 2014 telephone call with MacKenzie and Faucheux, MacKenzie sent Goitia a lengthy email filled with misrepresentations to make it appear as though LSR had not agreed to the terms for the Deal. For instance, MacKenzie listed a number of purported "development gaps between LSR's position and Peaker's" which were completely fictitious and contrary to the prior agreement and understanding between LSR and Plaintiffs. LSR had never before mentioned any such "gaps", as Goitia later explained in a point-by-point email rebutting each of MacKenzie's spurious claims.

In a telephone conversation on January 12, 2014, MacKenzie stated to Goitia that, despite the misrepresentations contained in his January 9 email to Goitia, the real issue was that Plaintiffs had discussed the Project with Cargill. Although Plaintiffs repeatedly communicated to LSR that they stood prepared to continue with the partnership that Plaintiffs and LSR had agreed upon, Faucheux, in an email dated February 3, 2014, stated that LSR had "terminated negotiations" with Plaintiffs.

Prior to Faucheux's purported "termination" of the relationship, Cargill and Peaker entered into a Non-Disclosure Agreement entitled "Mutual Confidentiality Agreement," dated January 14, 2014 ("Cargill NDA")."The Cargill NDA is retroactive, relating to "[a]ny information exchanged by or between the Parties before the Effective Date," and it therefore extends to the initial discussions with Cargill described herein on December 31, 2013.

Upon information and belief, LSR and Cargill violated the terms of their respective NDA's described herein by sharing information about the Project that the NDAs required to be maintained confidential. LSR and Cargill each failed to observe the terms of the NDAs that they signed with Peaker, which failure, at the very least, constitutes a breach of their respective duties of business honesty, good faith, and fair dealing. LSR, through its continuous dealings with Plaintiffs and the

6

representations and assurances it made to Plaintiffs throughout those dealings, upon which Plaintiffs relied to make substantial investments toward the Project, became a *de facto* partner of Plaintiffs. LSR violated its duties as Plaintiffs' partner by impermissibly sharing information and misleading Plaintiffs.

## LAW AND ANALYSIS

### I.   Rule 12(b)(6) Principles

Rule 12(b)(6) authorizes the filing of motions to dismiss asserting, as a defense, a plaintiff's "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6). Thus, claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).  Dismissal under Rule 12(b)(6) also is warranted if the complaint does not contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at  678 (quoting *Twombly*, 550 U.S. at 570).

In evaluating motions to dismiss filed under Rule 12(b)(6), the Court "must accept all well-pleaded facts as true, and . . . view them in the light most favorable to the plaintiff." *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th. Cir.), *cert. denied,* 476 U.S. 1159 (1986).  Further, "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne,* 252 F.3d 352, 357 (5th Cir. 2001).  On the other hand, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986);  *see also Iqbal,* 556 U.S. at 678 ("tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of  'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557);  *see also Christopher v. Harbury*, 536 U.S. 403, 416 (2002) (elements of a plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant").

7

Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – "that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 678 (quoting Fed. Rule Civ. P. 8(a)(2)).  Thus, a complaint's allegations "must make relief plausible, not merely conceivable, when taken as true." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009);  see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").

 "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Factual allegations that are "merely consistent with a defendant's liability, stop short of the line between possibility and plausibility of entitlement to relief," and thus are inadequate.  *Id.*  (internal quotations omitted).  Thus, the requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the *reasonable* inference that the defendant is liable for the misconduct alleged."  *Id.* (emphasis added).  "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (internal citations omitted).  See also *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (degree of required specificity depends on context, *i.e.*, the type of claim at issue).

In addition to Rule 8(a)(2)'s pleading demands, Rule 9(b) supplements Rule 8(a), if fraud is alleged, by requiring circumstances allegedly constituting fraud be stated with particularity. *See* Fed. R. Civ. Proc. 9(b); *Grubbs,* 565 F.3d at 185.  Thus, Rule 9(b) generally requires the plaintiff to set forth the "who, what, when, where, and how" of the alleged fraud." *See, e.g., United*

*States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010);  *see also Sullivan*

*v. Leor Energy, LLC,* 600 F.3d 542, 550-51 (2010) (claimant must "specify the statements contended

to be fraudulent, identify the speaker, state when and where the statements were made, and explain

why the statements were fraudulent").  Significantly, however, courts must realistically observe that

"there is no single construction of Rule 9(b) that applies in all contexts." *Grubbs*, 565 F.3d at 188.

Indeed, the Fifth Circuit has explained that the "'time, place, contents, and identity' standard is not

a straitjacket for Rule 9(b)." *Id.* at 190.  "Rather, the rule is context specific and flexible . . . ." *Id.*

On the other hand, a relator cannot bypass  Rule 9(b)'s pleading requirements simply by premising

its allegations "on information and belief." *Thompson,* 125 F.3d at 903.  To the contrary, though

fraud may be alleged on information and belief if the "facts relating to the fraud are peculiarly within

the perpetrator's knowledge," the complaint nevertheless "must set forth a factual basis for such

belief." *Id.*

        In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss,

the factual information to which the Court addresses its inquiry is limited to the (1) the facts  set

forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial

notice may be taken under Federal Rule of Evidence 201.  See *Norris v. Hurst Trust,* 500 F.3d 454,

461, n.9 (5th Cir. 2007);  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 640, n.2 (5th Cir. 2005).  When

a defendant attaches documents to its motion that are referred to in the complaint and are central to

the plaintiff's claims, however, the Court can also properly consider those documents.  *Causey v.*

*Sewell Cadillac–Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004);  *In re Katrina Canal Breaches*

*Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "In so attaching, the defendant merely assists the plaintiff

in establishing the basis of the suit, and the court in making the elementary determination of whether

a claim has been stated." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000).

This Court, therefore, may properly consider the documents referenced in the Amended Complaint.

## II.   <u>Application of Rule 12(b)(6) Principles</u>

In this action, Plaintiffs' Amended Complaint asserts ten claims for relief.  Plaintiffs' characterize their eight claims against LSR as "centered on two distinct agreements: (1) the August 20, 2013 Non-Disclosure Agreement, titled "Confidentiality Agreement - Site Business Development" ("LSR NDA"), and (2) the January 3, 2014 verbal agreement between LSR and the Plaintiffs to engage in a business venture to create a first-of-its-kind distribution point and transportation hub for crude, refined projects, natural gas liquids, and biofuels at the ideally situated property owned by LSR at its Terminal Site on the Mississippi River in Gramercy, Louisiana ("January 3 Verbal Agreement")."[3]

With respect to Defendant Cargill, Plaintiffs' claims are premised upon Cargill's alleged "misappropriation" of the Project.[4]  More specifically, Plaintiffs contend that, upon learning the details of the Project, Cargill, which previously had unsuccessfully tried to develop a similar project at another site, concluded that it wanted the Project for itself, and thus caused LSR (the joint venture between Cargill and SUGAR) to reverse course and terminate its relationship with Plaintiffs.[5]  In other words, Plaintiffs maintain: "Cargill worked behind the scenes to sabotage the Project, which by all claims from LSR – prior to Cargill's involvement – had received the green light."[6]

---

[3]     See Plaintiffs' Memorandum in Opposition to LSR Motion to Dismiss (hereinafter, "Plaintiffs' LSR Opp."), Sealed Rec. Doc. 15-2, p. 7 of 39.

[4]     See Plaintiffs' Memorandum in Opposition to Cargill's Motion to Dismiss (hereinafter, "Plaintiffs' Cargill Opp."), Sealed Rec. Doc. 16-2, p. 7 of 36.

[5]     *Id*. at p. 8 of 36 - p. 12 of 36.

[6]     *Id*. at p. 12 of 36.

Plaintiffs' eight claims against LSR are:  (1) Violation of the Louisiana's Unfair Trade Practices Act ("LUTPA") (Claim One); (2) Intentional and Negligent Misrepresentation (Claim Two); (3) Fraud (Claim Three); (4) Breach of the LSR NDA (Claim Four);  (5) Breach of the January 3 Verbal Agreement (Claim Five);  (6) Breach of the Implied Duty of Good Faith and Fair Dealing (Claim Six); (7)Detrimental Reliance (Claim Seven); and (8) Unjust Enrichment (Claim Ten).

Plaintiffs' six claims against Cargill are: (1) Violation of the Louisiana Unfair Trade Practices Act  ("LUTPA") (Claim One); (2) Breach of the Cargill NDA (Claim Four); (3) Breach of the Implied Duty of Good Faith and Fair Dealing (Claim Six); (4) Tortious Interference with Contract (Claim Eight); (5) Tortious Interference with Business Relationship (Claim Nine); and (6) Unjust Enrichment (Claim Ten).[7]

A.    Breach of Contract - LSR NDA and Cargill NDA (Claim Four)

Focusing first on Plaintiffs' breach of contract claims relative to Defendants' alleged breaches of the "confidentiality" and "non-circumvention" provisions of the August 20, 2013 LSR NDA[8] and the January 14, 2014 Cargill NDA,[9] and applying the foregoing legal principles to those

---

[7]    Plaintiffs' unjust enrichment claims are asserted in the alternative; that is, to the extent that the Court concludes that Plaintiffs are not entitled to relief relative to any of their other claims, Plaintiffs seek an award of damages under the law of unjust enrichment. See Amended Complaint, Rec. Doc. 4, ¶¶ 113-115.

[8]    As set forth above, the LSR NDA  specifically precluded LSR from any "attempt in any manner to contact or deal with any . . . individuals or companies identified in the confidential information in connection with or related to the project or business plan proposed by the company [Peaker]" and from acting to "by-pass, compete, avoid, circumvent, or attempt to circumvent the company [Peaker] relative to the proposed project . . . .  See Amended Complaint, Rec. Doc. 4,  ¶¶ 23-25; see also LSR's Memorandum in Support ("LSR's Mem."), Sealed Rec. Doc. 6-6, p. 5

[9]    Pursuant to the Cargill NDA, "Evaluation Material"  was furnished to Cargill "subject to, and in consideration of [Cargill's] agreement to maintain its confidentiality, to use it solely for evaluation of a possible business transaction, and for no other purpose, including any way, directly

claims, the Court concludes that Defendants' motions to dismiss should be granted in part and denied in part relative to Claim Four of the Amended Complaint.

Specifically, LSR's motion maintains, as an initial matter, that Plaintiff ECLT lacks standing relative to the LSR NDA because the text of that document describes the agreement as one between Peaker and LSR and fails to expressly identify any other legal entity as a party thereto. Disagreeing, Plaintff ECLT contends that the contractual language in the LSR NDA, when considered together with the Amended Complaint's averments that Goitia formed ECLT for the sole purpose of executing the Project at LSR, and advised LSR's representatives of ECLT's intended role as part of the proposal made to it by Plaintiffs on August 13, 2013, sufficiently allege that the contracting parties, Peaker and LSR, granted third-party beneficiary status, via stipulation *pour autri*,[10] to ECLT such that ECLT is entitled to demand performance from LSR. See La. Civ. Code arts. 1978 - 1982. Given that instant motion is directed to the Plaintiffs' allegations in the Amended Complaint, rather than a summary judgment motion, urged with the benefit of discovery and proper citation of legal authority, the Court presently declines to dismiss the breach of contract claim that Plaintiff ECLT asserts relative to the LSR NDA. Thus, Defendant's motion relative to ECLT's standing is denied.

LSR's motion is granted, however, to the extent that Plaintiffs' claims rest on the

---

or indirectly detrimental to [Peaker], or any of its affiliates or subsidiaries." Evaluation Material is defined as "certain information (written and oral) respecting the business, property, business and development plans, locations or prospective locations of project development and business plans and ideas, and operations of the Disclosure and those of its affiliates and subsidiaries." See Plaintiffs' Cargill Opp., Sealed Rec. Doc. 16-2, pp. 33; see also Amended Complaint, Rec. Doc. 4, ¶¶ 67-68.

[10]     For a contract to establish an enforceable third party benefit: (1) the third party benefit must be manifestly clear; (2) the benefit provided to the third party must be certain; and (3) the benefit cannot be a mere incident of the contract between the promisor and the promisee. See *Joseph v. Hospital Service District No. 2,* 05-2364 (La. 10/15/06); 939 So.2d 1206, 1212.

assertion that "LSR's Business Development Consultant, Scott MacKenzie [], admitted at a January 3, 2014 meeting . . . that LSR had conducted discussions with other transload companies, which prompted Goitia to remind him that such discussions constituted a violation of the LSR NDA."[11] Because the Amended Complaint does not allege that LSR's discussions with other transload companies occurred on a date *subsequent to* the August 20, 2013 effective date of the LSR NDA, or the alleged content of the discussions, it is not apparent that such discussions yield a viable breach of contract claim.

Conversely, for essentially the reasons set forth by Plaintiffs in opposition to Defendants' motions,[12] both motions are denied to the extent that dismissal of Plaintiffs' claims under the Cargill NDA and the LSR NDA is sought relative to alleged communications between LSR and Cargill regarding the Project and the anti-circumvention provisions of the agreements. In short, construing the allegations of Plaintiffs' Amended Complaint regarding Defendants' averred conduct, together with pertinent language of the NDA's, the Court presently is not persuaded that Plaintiffs' breach of contract claims, premised upon the confidentiality and anti-circumvention provisions of the NDA's, fail as of a matter of law. And, insofar as Defendants contend that further pleading clarity relative to the factual bases of these claims is required, they can obtain such information via discovery and then, if warranted, file a motion for summary judgment regarding the claims.

B.    Breach of Contract - "January 3 Verbal Agreement" (Claim Five)

Plaintiffs' Amended Complaint also purports to state a breach of contract claim

---

[11]    See Plaintiffs' LSR Opp., Sealed Rec. Doc. 15-2, p. 10 of 39; see also Amended Complaint, Rec. Doc. 4, ¶ 50.

[12]    See Plaintiffs' LSR Opp., Sealed Rec. Doc. 15-2, pp. 9 of 39 - 14 of 39; Plaintiffs' Surreply Memorandum in Opposition (hereinafter "Plaintiffs' LSR Surreply"), Sealed Rec. Doc. 28, pp. 1-2;  Plaintiffs' Cargill Opp., Sealed Rec. Doc. 16-2, p. 13 of  36 - p. 15 of 36.

against LSR that is premised upon the "binding verbal agreement" allegedly reached by Plaintiffs (through Goitia) and LSR (through MacKenzie and Faucheaux), on January 3, 2014 (the "January 3 Verbal Agreement"), and LSR's subsequent refusal to move forward with the Project.  Regarding the existence of a binding agreement, Plaintiffs allege that "the agreement between LSR and Plaintiffs to pursue the Project together was finalized on January 3, 2014," that is, "on January 3, 2014 . . . Goitia, Faucheaux, and MacKenzie reached a verbal agreement on the Deal."[13]  The Deal is defined, in the Amended Complaint, as "the terms of the agreement to effectuate the Project."[14]

In seeking dismissal of this claim, LSR contends that the alleged January 3 Verbal Agreement is legally unenforceable because the Project contemplates certain transfers and encumbrances of immovable property and the January 3 Verbal Agreement lacks the written form required, under Louisiana law, for such transactions.[15]  Plaintiffs disagree, urging that the January

---

[13]     See Plaintiffs' LSR Opp., Sealed Rec. Doc. 15-2, p. 15 of 3p. 14-17.

[14]     See Amended Complaint, Rec. Doc. 4, ¶¶0.

[15]     See, e.g., La. Civ. Code art. 518 ("ownership of an immovable is voluntarily transferred by a contract between the owner and transferee that purports to transfer the ownership of the property"); arts. 533 and 534 ("There are two kinds of servitudes: personal servitude and predial servitude."); art. 639 ("personal servitude of right of use confers in favor of a person a specified use of an estate less than full enjoyment"); art. 645 (right of use is regulated by application of the rules governing habitation and predial servitudes to the extent their applications is compatible with the rules governing a right of use servitude); art. 708 (establishment of a predial servitude by title is an alienation of part of the property to which the laws governing alienation of immovables apply); art. 722 (predial servitude established by all acts by which an immovable may be transferred) art. 1839 (transfer of immovable property must be in writing absent actual delivery of the property accompanied by the transferor's recognition of the validity of the transfer under oath); art. 2440 (sale or promise of sale of an immovable must be made authentic act or by act under private signature except as provided in Article 1839);  art. 2620 (option to buy or sell must set forth the thing and the price and meet the formal requirements of the sale it contemplates);  art. 2623 (bilateral promise of sale, or contract to sell, must set forth the thing and the price and meet the formal requirements of the sale it contemplates); art. 2442 (parties to an act of sale or promise of sale of immovable property are bound from the time the act is made); see also *Jones v. Hospital Corp*. 516 So.2d 1175, 1177 (La. App. 2 Cir. 1987) (construing  *pacte de preference* (right of first refusal) regarding an

3 Verbal Agreement is properly characterized as an agreement to "engage in a business venture" and "in its simplest terms, a business deal, and agreement to go into business together," rather than an agreement to encumber, purchase, or sell immovable property, such that it is enforceable notwithstanding the absence of a written contract.[16]  And, while acknowledging that the Project contemplates the parties entering into a lease relative to Plaintiffs' use of LSR's terminal site, Plaintiffs emphasize that Louisiana law excepts leases from the transactions involving immovable property that must be in writing to be enforceable.

"Unless the law prescribes a certain formality for the intended contract," a contract is formed by the consent of the parties established through offer and acceptance made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. .See La. Civ. Code art. 1927;  see also *Hanger One MLU, Inc. v. Unopened Succession of Rogers*, 981 So.2d 175 (La. App. 2 Cir. 2008) (formation of a valid and enforceable contract under Louisiana law requires capacity, consent, a certain object, and lawful cause; consent requires a meeting of the minds of the parties).  Plaintiffs are correct that leases of  immovable property generally are not required by law to be in writing to be enforceable between the parties thereto.[17]

On the other hand, as additionally urged by both LSR and Cargill, where a written contract is not mandated by law, but the contracting parties "have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form."[18]  See

---

immovable as contract to sell an immovable, which must be in writing).

[16]        See Plaintiffs' LSR Opp.,  Rec. Doc. 15-2, p. 7 of 39 and p. 23 of 39.

[17]        See La. Civ. Code art. 2681 (leases may be made orally or in writing, but are ineffective as to third persons "until filed for recordation in the manner prescribed by legislation").

[18]        See La. Civ. Code art. 1947.

La. Civ. Code art. 1947.  Further, a "contract to enter into a lease at a future time is enforceable by either party *if* there was agreement as to the thing to be leased *and* the rent, *unless* the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon. See La. Civ. Code art. 2670 (emphasis added).  Consistent with these articles, Defendants contend that Plaintiffs and LSR were not bound to any agreement regarding the terms of the Deal and the Project unless and until a written contract setting forth the terms of the parties' agreement was executed by the parties – and no such document ever was executed.  Having carefully reviewed the parties' memoranda, the Amended Complaint, and the documents submitted by the parties,[19] the Court agrees with Defendants that the allegations of the Amended Complaint do not sufficiently establish the contrary.  Under the circumstances, the Court likewise finds the factual information presently set forth in the Amended Complaint, particularly when considered in light of the December 9th Term Sheet, insufficient to support a reasonable inference that LSR and Plaintiffs, both sophisticated business entities, actually reached a meeting of the minds, in writing or verbally, regarding the essential components of the alleged Deal, i.e. the key elements necessary to implement Plaintiffs' plan (the Project) to use LSR's terminal site as a water and rail distribution point for crude oil, refined products, natural gas liquids and biofuels.[20]

In support of these conclusions, the Court notes that the Amended Complaint's averment that the binding January 3 Verbal Agreement, "incorporated and built upon the most recent

---

[19]    Although not attached to the Amended Complaint, the documents are referenced therein.

[20]    See *Carter v. Financial Advisor & Consulting*, 44 So.2d 646, 647 (La. App. 1 Cir. 1983), *writ denied*, 446 So.2d 313 (La. 1984) ("Both parties must agree to the substantial elements of a contract in order to have a binding obligation.").

term sheet that they had exchanged."[21]   LSR asserts, and Plaintiffs do not deny, that the most recent

term sheet was exchanged by the parties on December 9, 2013.[22] That term sheet  ("December 9th

Term Sheet"), which is a document entitled "Gramercy, Louisiana  Land Lease Consideration and

Key Terms," characterizes the December 9th Term Sheet as "non-binding" and "presented for

discussion purposes only," except with respect to the "Exclusivity," "Confidentiality" and "Access"

provisions, which "shall be binding upon execution of [the December 9th Term Sheet].[23]   The

December 9th Term Sheet, however, is unsigned.

       The December 9th Term Sheet further states: "This Term Sheet is not an offer

capable of being accepted and the proposed Transaction (defined below) is subject in all respects

to further due diligence by the Parties, the approval of each Party's respective Board of Directors (or

similar governing body), and the Parties' execution of a definitive and written Lease Agreement that

will  formalize  the  projected  Transaction."[24]   In  addition  to  the  execution  of  a  written  lease

agreement, the December 9th Term Sheet identifies a number of other transactions to be completed

relative to the creation or transfer of interests in immovable property, including (1) an "option to

purchase" the LSR land to be leased, and the dock to be used; (2) easements to LSR land that is not

part of the lease and a separate easement agreement (the "LSR Easements"); (3) an option to

purchase rail road tracks, pipelines and other unspecified improvements; (4) an easement and access

---

[21]     See Amended Complaint, Rec. Doc. 4, ¶ 49.

[22]     *Id.* at Amended Complaint, Rec. Doc. 4, ¶32  ("Plaintiffs and LSR worked together to finalize the terms of the Deal, exchanging at least five rounds of term sheets for the Deal between October 20, 2013 and December 9, 2013.").

[23]     See LSR's Mem., Sealed Rec. Doc. 6-7, p. 2 of 13 and 8 of 13..

[24]     *Id*. at 2 of 13.

right to the "KCS property."[25]  It also states that "ECLT will require the use and eventual ownership of parcels of land and/or improvements thereon adjacent to the LSR Land not currently owned by LSR" and  identifies obtaining, relative to that adjacent land, "the same or substantially similar purchase option rights and right of first refusal rights as to ECLT's rights to the LSR Land" as one of LSR's obligations.[26]

Notwithstanding the foregoing, and Plaintiffs' characterization of their business plans for the Project as "an extremely valuable asset . . . valued at nearly $1 billion," the Amended Complaint's *only* description of the terms of the allegedly binding *verbal* agreement, reached on January 3rd, is that it "incorporated and built upon the most recent term sheet that they had exchanged."[27]  Significantly, the Amended Complaint does not provide even a general explanation of how the December 9th Term Sheet  was "built upon," and fails to affirmatively allege that the parties expressly agreed to dispense with the December 9th Term Sheet's writing requirements and the necessity of obtaining the approval of each party's respective Board of Directors (or comparable governing body). Nor do Plaintiffs explain how Faucheaux, LSR's Chief Executive Officer and General Manager, and MacKenzie, LSR's Business Development Consultant had authority to obligate LSR to such an agreement.[28]  Plaintiffs' allegations similarly fail to offer a reasonable

---

[25]        *Id.* at 2 of 13 - p.3 of 13.

[26]        *Id.* at p. 3 of 13 and p. 6 of 13.

[27]        See Amended Complaint, Rec. Doc. 4, ¶49.

[28]        Certain requirements exist relative to a business entity acting through an agent. Civil Code article 2996 requires a mandatary's authority to "alienate, acquire, encumber, or lease a thing be given expressly.  "  See La. Civ. Code art. 2996.  Further, pursuant to La. R.S. 12:317, "alienation, lease, or encumbrance of its immovables" are excluded from the matters in the ordinary course of a limited liability company's business for which "each member of a limited liability company, if management is reserved to the members, or manager, if management is vested in one

explanation for such an extreme and sudden change of course.

Given the foregoing, the Court finds the allegations of the Amended Complaint, relative to the January 3 Verbal Agreement, insufficient to state a viable breach of contract claim upon which relief can be granted.   Accordingly, LSR's motion to dismiss is granted relative to Count Five of the Amended Complaint.

C.      Intentional and Negligent Misrepresentation/Fraud/Detrimental Reliance
         (Claims Two, Three, and Seven)

In Claims Two, Three, and Seven of the Amended Complaint, Plaintiffs seeks an award of damages against LSR on grounds of negligent and intentional misrepresentation, fraud, and detrimental reliance.   In paragraphs 80 and 81 of the Amended Complaint, Plaintiffs refer specifically to (1) LSR's representations of authority to agree to the terms of the Project[29] and (2) LSR's representations of its ability to acquire immovable property adjacent to its immovable property.    In their opposition memorandum, however, Plaintiffs characterize additional representations (set forth in other paragraphs in the Amended Complaint) as being fraudulent

---

or more managers pursuant to R.S. 12:1312, is a mandatary of the limited liability company[,] unless such mandate is restricted or enlarged in the articles of organization or unless such member or manager lacks the authority to act for the limited liability company and the person with whom he is dealing has knowledge of the fact that he lacks such authority."  See La. R.S. 12:317.  Finally, although "the contract of mandate is not required to be in any particular form"[,] when  the law prescribes a certain form for an act, a mandate authorizing the act must be in that form.  See La. Civ. Code art. 2993.

[29]      Paragraphs 30 and 31 of the Amended Complaint (Rec. Doc. 4) state: "Throughout that period, LSR expressed enthusiasm for the Project and reassured Plaintiffs that the Project would go forward once LSR and Plaintiffs finalized the terms of the agreement to effectuate the Project (the Deal).  Further, on several occasions, LSR stated that it had obtained board approval for the Project and all that remained for the Project to be finalized was to present an agreement acceptable to LSR's Chief Executive Officer and General Manager, Larry Faucheux."

misrepresentations.[30]

To prevail on a claim for negligent misrepresentation, Plaintiffs must prove that: (1) LSR supplied false information in the course of its business or other matters in which it had a pecuniary interest; (2) LSR had a legal duty to supply correct information to the Plaintiffs; (3) LSR breached that duty by omission or affirmative misrepresentation; and (4) Plaintiffs suffered damages or pecuniary loss as result of its justifiable reliance upon LSR's omission or affirmative misrepresentation. See *Hardy v. Hartford Ins. Co.*, 236 F.3d 287, 292 (5th Cir. 2001). To establish a intentional misrepresentation claim, Plaintiffs must prove that: (1) LSR made misrepresentation of material fact; (2) the misrepresentation was made with the intent to deceive; and (3) Plaintiffs justifiably relied on the misrepresentation which caused injury. *Kadlec Medical Center v. Lakeview Anesthesia Associates*, 527 F.2d 412, 418 (5th Cir. 2008).

With respect to fraud, Louisiana Civil Code article 1953 provides that "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code art. 1953.[31] "Fraud cannot be predicated on statements that are promissory in nature or relating to future events. " *Taylor v. Dowling Gosslee & Associates, Inc*., 44,654 (La. App. 2d Cir. 10/7/09); 22 So. 3d 246, 255; see also *Metropolitan Life Ins. Co.,* 158 F.3d 484, 1998 WL 648603, *6 (5th Cir. 1998) (unpub.) ("As a general rule, the failure to perform the terms of a contract is breach of contract, not a tort."). Fraud "can be predicated[, however,] on

---

[30]     Plaintiffs' LSR Opp. Sealed Rec. Doc. 15-2, p. 22 of 39 - p. 23 of 39.

[31]     Fraud may vitiate consent. See La. Civ. Code art. 1948. Such vitiation does not occur, however, " when the party against whom fraud was directed could have ascertained the truth without difficulty, inconvenience or special skill," unless "a relation of confidence induced a party to rely on the other's assertions or representations." La. Civ. Code art. 1954.

20

promises made with the intention not to perform at the time the promise is made." *Benton v. Clay*, 123 So.3d 212 La. App. 2 Cir. 2013 (citing *Automatic Coin Enter., Inc. v. Vend–Tronics, Inc.*, 433 So.2d 766 (La. App. 5th Cir.1983), *writ denied,* 440 So.2d 756 La.1983)).  Failure to perform as promised, or nonperformance of an agreement to do something at a future time, however,  is alone not evidence of fraud. *Taylor*, 22 So. 3d at 255.  Recovering tort damages for fraud requires proving  an intent  to defraud and actual or potential loss or damage. Id. at  255.

"Detrimental reliance  is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." *Benton v. Clay,* 2013-48,245 ( La. App. 2d Cir. 08/07/13), 123 So.3d 212, 222.  To establish a viable detrimental reliance claim, a plaintiff must prove: (1) the defendant's representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. *Id.*  Because detrimental reliance is not based upon the intent to be bound, prevailing on a detrimental reliance claim does not require proof of a formal, valid, and enforceable contract. *Id*. (citing *Suire v. Lafayette City–Parish Consol. Gov't,* 2004–1459 (La. 4/12/05), 907 So.2d 37; *Allbritton v. Lincoln Health Syst., Inc*., 45,537 (La. App. 2d Cir.10/20/10), 51 So.3d 91).  "Rather, the basis of detrimental reliance is the idea that a person should not harm another person by making promises that he will not keep." *Id.*  Thus, the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment." *Id.*

As explained above,  Federal Rule of Civil Procedure  9(b) requires that fraud or mistake be plead with particularity.  As such,  a plaintiff pleading fraud must "specify the statements contended

to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 339 (5th Cir. 2008). Rule 9(b) requires a plaintiff to plead specific facts that support an inference of fraud; merely alleging that a defendant possessed fraudulent intent is insufficient. *Id*. The Fifth Circuit has also subjected ruled negligent misrepresentation claims to Rule 9(b)'s heightened pleading requirements when the plaintiff's focus rests on the same facts for both fraud and misrepresentation claims. See *Benchmark Electronics, Inc. v. J.M. Huber Corp*., 343 F.3d 719, 723-24 (5th Cir. 2003); *Williams v. WMX Techs., Inc*., 112 F.3d 175, 177 (5th Cir. 1997).

LSR's motion asserts that Plaintiffs have not met the Rule 9(b) requirement, and instead have simply made conclusory allegations regarding the elements for a cause of action for fraud and misrepresentation. LSR also argues that Plaintiffs could not reasonably rely on LSR agents' alleged verbal representations of LSR's ability to acquire ownership of neighboring property, without further inquiry, because such transactions require a writing. And, finally, LSR contends that Plaintiffs could have ascertained the truth of the alleged false statements without difficulty and were not excused from such due diligence by virtue of a relation of confidence that has reasonably induced a party to rely on the other's assertions.

Plaintiffs' allegations relative to these claims are deficient for a number of related reasons. First, Plaintiffs' factual assertions fail to support a reasonable inference that LSR's alleged misrepresentations regarding its authority to enter into a binding agreement with Plaintiffs and/or the LSR's ability to acquire neighboring properties, were made with the intent to deceive. Indeed, Plaintiffs' allegations maintain that all was going as planned between them and Defendant LSR until Defendant Cargill became aware of the proposed Project, and wanting to have the benefits of the

proposed arrangement for itself, used its influence and power as a 50% owner of LSR to sabotage LSR's and Plaintiffs' dealings. Plaintiffs' assertions relative to LSR's alleged misrepresentations of its ability to acquire ownership of neighboring property are similarly lacking.

Second, Plaintiffs' allegations regarding these claims do not sufficiently set forth the nature and extent of their alleged reliance on LSR representations, or the reasonableness of that reliance. Indeed, though Plaintiffs purport to have relied on representations by LSR that "it had obtained board approval for the Project and all that remained for the Project to be finalized was an agreement acceptable to LSR's Chief Executive Officer and General Manager, Larry Faucheaux," Plaintiffs do not identify the person(s) purportedly making such statements on LSR's behalf or their date(s). Nor is  it evident to the Court, given the apparent lack of certainty regarding the remaining key components of the Project, as described above, and as evidenced by the December 9th Term Sheet and the January 2014 email between Goitia, Faucheaux, and MacKenzie, exactly what terms Plaintiffs reasonably believed LSR's Board had approved or could have approved at that juncture. Further, as stated above, regarding the January 3 Verbal Agreement,  Plaintiffs offer no explanation why it was reasonable for them to believe that Faucheaux, LSR's Chief Executive Officer and General Manager, and MacKenzie, LSR's Business Development Consultant – neither of whom are alleged to be members or managers of the LSR – had authority to obligate LSR to such an agreement and why it was reasonable for Plaintiffs to invest substantial resources into the Project without receiving some written evidence of the Board's approval.  The same is true relative to Plaintiffs' assertions of reliance on representations (by unnamed person(s)) that LSR either presently owned, or had options to buy, the additional neighboring property that Plaintiffs sought to utilize for the Project. Given the form requirements for transfers of immovable property, including options thereto,

written evidence of these alleged rights should have been readily available for Plaintiffs' review in as part of its own due diligence inquiry.[32]

Third, Plaintiffs' allegations do not support a fair inference that a relation of confidence existed between them and LSR such that Plaintiffs were not obligated to make a reasonable inquiry regarding the validity of LSR's agents' alleged misrepresentations.   Although the LSR NDA imposed a duty of confidentially on both parties, that duty existed only relative to the proper use of the confidential information that the parties shared with each other and is not reasonably construed as transforming LSR and Plaintiffs' arms-length business negotiation into a relationship for which due diligence was no longer required.  Indeed, contrary to Plaintiffs' assertion that LSR became Plaintiffs' *de facto* partner relative to the Project, the LSR NDA specifically provides that neither it or the prior relationship between the parties creates or has created "a relationship of agency, partnership, joint venture, or license" between the parties.[33]

Fourth, although Plaintiffs' ability to establish their reasonable reliance relative to certain elements of their damage claims is not entirely inconceivable, the allegations of their Amended Complaint, in their present state, fail to adequately convey that message. For instance,  Plaintiffs do not adequately explain the chronology of pertinent events, including the timing of and reasoning behind the incurrence of the claimed expenses, in such a manner that a reasonable inference regarding the propriety of Plaintiffs' alleged reliance can be drawn.  Nor do Plaintiffs identify which expenses they allegedly would have not incurred but for LSR's representations versus those independently undertaken by Plaintiffs as part of its own evaluation of the suitability of LSR's

---

[32]     See footnote 28, *supra*.

[33]     See LSR's Mem., Sealed Rec. Doc. 6-6, p.5 of 7.

Terminal Site for the Project.  See *Sun Drilling Prod. Corp. v. Rayborn*, 00-1884 (La. Ct. 4th  Cir. 10/3/01); 798 So. 2d 1141,  1153 ("for fraud or deceit to have caused plaintiff's damages, he must at least be able to say that had he known the truth, he would have not acted as he did to his detriment").  Accordingly, the Court finds the present allegations of Plaintiffs' Amended Complaint inadequate to state viable claims of intentional or negligent misrepresentation, fraud, or detrimental reliance.

        D.       <u>Breach of the Implied Duty of Good Faith and Fair Dealing (Claim Six)</u>

        In Claim Six of the Amended Complaint, Plaintiffs avers that Defendants LSR and Cargill breached implied duties of good faith and fair dealing arising from the LSR NDA and the Cargill NDA. The claim asserted against LSR is premised upon the covenant of good faith and fair dealing that Louisiana law recognizes as implied in every contract, and, importantly, dictates the elements of recoverable breach of contract damages. See La. Civ. Code art.1983 ("Contracts must be performed in good faith." );  art. 1994 ("obligor is liable for the damages caused by his failure to perform");  art. 1996 ("obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made"); and art. 1997 ("obligor in bad faith is liable for all damages, foreseeable or not, that are direct consequence of his failure to perform").

        As LSR contends, without an enforceable contract, there can be no breach of an implied contractual duty of good faith.  See, e.g., *Spillway Investments, L.L.C. v. Pilot Travel Centers LLC*, No. 04-cv-2451, 2005 WL 517498 * 7 (E.D. La. Feb. 22, 2005) (Engelhardt, J.); *Adams v. Autozoners, Inc.*, No. 98-cv-2336, 1999 WL 744039, *7 (Sept. 23, 1999) (Vance, J.). , the statutory good faith obligation, which arises only in the context of performance of a contract, cannot be used to create a contract where none exists. See, e.g. *Domed Stadium Hotel v. Holiday Inns, Inc.,*

732 F.3d 480, 485 (5th Cir. 1984);  *Jones v. Honeywell Int'l* Inc., 295 F. Supp.2d 652, 671-72 (M.D. La.2003).  Accordingly, because the Court did not find Plaintiffs' allegations sufficient to establish the existence of an enforceable contract, based on the January 3 Verbal Agreement,  much less that it was breached,  a corresponding  breach of the implied obligation of good faith and fair dealing is likewise unavailing. Conversely, as set forth above, the Court  has found Plaintiffs to have stated a viable breach of contract claim relative to the LSR NDA and, in paragraph 92 of the Amended Complaint, Plaintiffs assert, relative to the NDA's, that LSR and Cargill breached their contractual obligations in bad faith. Thus, the Court must determine whether Plaintiffs have plead facts sufficient to permit a  reasonable inference that a  viable claim for breach of the obligation of good faith and fair dealing has been stated  relative to that contract.[34]

A contracting party's mere failure to fulfill an obligation imposed by contract does not automatically breach its duty of good faith and fair dealing. See, e.g., *Administrators of the Tulane Educational Fund*, 2011 WL 3268108, *5 (E.D. La. July 28, 2011) (Vance, J.).  Rather,  bad faith requires more than "mere bad judgment or negligence, it implies the conscious doing or a wrong for dishonest or morally questionable motives." *Id.* (citing *Industrias Magromer Cueros y Pieles S.A. v. Louisiana*, 293 F.3d 912, 922 (5th Cir. 1992)).  Thus, to establish such a breach, a party must allege the defendant's actions were prompted by fraud, ill will, or sinister motive. *Id.;* see also *Bd. of Supr.'s of Louisiana State Univ. v. Louisiana Agr. Fin. Auth.,* 07–0107 (La. App. 1

---

[34]    Although a breach of the duty of good faith and fair dealing is designated as a separate claim for relief (Claim Six) from  Plaintiffs' breach of contract claims (Claims Four and Five), the Court, with respect to the LSR NDA, is construing Claim Six to simply seek the measure of damages, allowed by Louisiana Civil Code article 1997, for bad faith breaches of contract. See La. Civ. Code art. 1997.  To the extent that Plaintiffs believe Louisiana law allows such a breach to constitute an independent claim for relief, Plaintiffs have not cited any supportive legal authority.

Cir. 2/8/08), 984 So.2d 72, 80 (bad faith generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties);  *Gross v. RSJ Intern., LLC,* No. 11-cv-83, 2012 WL 729955, *4 (E.D. La. March 6, 2012) (Vance, J.) (Homeowner's allegation that defendants defaulted on their obligations when they "walked off the job" upon receipt of what they knew to be the last of homeowner's Road Home monies was sufficient to raise an inference of bad faith).[35]

Here, Plaintiffs allege that LSR breached the LSR NDA by disclosing confidential information to Cargill without authority and, at Cargill's bidding, purposely acted to avoid or circumvent Plaintiffs relative to the proposed Project.  At this stage of the proceeding, it is not apparent to the Court that such allegations, if proven at trial, are necessarily insufficient, as a matter of law, to render LSR a "bad faith obligor" for purposes of the enhanced damages allowed by Civil Code article 1997.

Regarding Cargill, the Court has likewise concluded that Plaintiffs have pled a viable breach of contract claim against Cargill relative to the Cargill NDA.  Significantly, however, as Plaintiffs acknowledge, under Texas  law, an implied duty of good faith and fair dealing is *not* imposed upon all contractual relationships. See, e.g., Subaru of America, Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212 (Tex. 2002) (citing  *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 418 (Tex.1995)).  Rather, such a duty may be intentionally created by

---

[35]        See also La. Civ. Code art. 1997, cmt. (c)(" In the context of vices of consent, 'fraud' means a stratagem or machination to take unfair advantage of another party. 'Bad faith' better conveys the intended meaning here, that is, an intentional and malicious failure to perform. []A truly fraudulent failure to perform of course, would constitute bad faith under this Article."); La. Civ. Code art. 1770, cmt. (e) ("party to requirements contract that chooses to terminate it because he has an opportunity to sell the same things elsewhere at a higher profit could violate the good faith requirement if the other party cannot find an alternative source of supply").

express language in a contract or simply may arise as a result of a special relationship between the parties governed or created by a contract.  See *Bradley v. Phillips Petroleum* Co., 527 F. Supp.2d 661, 686-87 (S.D. Tex. 2007) (quoting *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987) and *Lovell v. Western Nat'l Life Ins. Co.*, 754 S.W.2d 298, 302 (Tex.App.-Amarillo 1988)).

"The special relationship necessary to create [this duty] either arises from the element of trust necessary to accomplish the goals of the contract, or has been imposed by the courts because of an imbalance of bargaining power." *Bradley,* 527 F. Supp. 2d at 686-87 ((quoting *Lovell*, 754 S.W.2d at 302) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983))). Other relationships giving rise to such a duty involve "long standing personal or social relationships," or proof of "dealings of long standing to justify reliance by the complaining party."  *Id.* (quoting *Lovell,* 754 S.W.2d at 302 (internal citations omitted).

Although Plaintiffs' now urge, in their opposition memorandum that an "apparent degree of unequal bargaining power existed between Plaintiffs, described as "two upstart, single member entities," and Cargill described as "one of the largest privately-held corporate entities in the world with operations that span nearly every major market."[36]  The Rule 12(b)(6) inquiry is directed to the allegations of a plaintiff's complaint, however, not a plaintiff's opposition memorandum,  and, as set forth by Cargill in its reply memorandum, the allegations of the Amended Complaint hardly suggest that Plaintiffs can fairly be characterized as simply  "two upstart, single member entities."[37]  Nor, also for the reasons stated by Cargill, is the Court presently convinced that the mere existence

---

[36]    See Plaintffs' Cargill Opp., Sealed Rec. Doc.  16-2, p.16 of 36.

[37]    See Cargill's Reply Mem., Sealed Doc. 24,  p. 7 of 15.

of the Cargill NDA, despite imposing a duty of confidentiality and limiting the uses for which the parties were to  use information disclosed thereto with the other,  or the limited  course of dealings between Cargill and Plaintiffs during the timeframe at issue, warrant imposition of an implied duty that Texas courts have hesitated to extend.[38]  Accordingly, the Court finds no basis to conclude that Plaintiffs have stated a viable claim against Cargill, under Texas law, for breach of an implied duty of good faith and fair dealing.

Given the foregoing, LSR's motion is granted in part (regarding the January 3 Verbal Agreement) and denied in part (regarding the LSR NDA) relative to an implied duty of good faith and dealing.  Cargill's motion is granted with respect to this claim.

E.    Louisiana's Unfair Trade Act ("LUTPA") (Claim One)

In Claim One, Plaintiffs seek relief under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1405, et seq., from both LSR and Cargill.  In *Cheramie Services, Inc. v. Shell Deepwater Production*, 09-1633, pp. 10-11 (La.4/23/10), 35 So.3d 1053, 1059-60,  the Louisiana Supreme Court described the applicability of this statute as follows:

> The applicable theory of recovery before this court is provided in LUTPA. Louisiana Revised Statutes § 51:1405(A) prohibits any "unfair or deceptive acts or practices in the conduct of any trade or commerce," and § 51:1409(A) grants a right of action to "[a]ny person who suffers any ascertainable loss" from a violation of this prohibition. It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition. *Dufau v. Creole Engineering, Inc.*, 465 So.2d 752, 758 (La. App. 5 Cir.), *writ denied*, 468 So.2d 1207 (La.1985) (In order to recover under LUTPA a plaintiff must prove "some element of fraud, misrepresentation, deception, or other unethical conduct" on the part of the defendant.).

The courts have repeatedly held that, under this statute, the plaintiff must

---

[38]    See Cargill's Memorandum ("Cargill's Mem."), Sealed Rec. Doc. 8-2, p. 19 of 34 - 22 of 34;  Cargill's Reply Mem., Sealed Doc. 24,  p. 7 of 15 - 8 of 15.

show the alleged conduct "offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Moore v. Goodyear Tire & Rubber Company,* 364 So.2d 630, 633 (La. App. 2 Cir. 1978) (Applying common meanings to the words of the statute, the court held a debtor had a right of action under LUTPA to recover actual damages for wrongful repossession of movables.); *see also Lilawanti Enterprises, Inc. v. Walden Book Company, Inc*., 95–2048 p. 6, 670 So.2d 558, 561 (Conclusory allegation by prospective subtenant of unethical, oppressive, unscrupulous or substantially injurious conduct on the part of a landlord were not supported by the record and did not controvert landlord's affidavits that  showed economic reasons for not accepting sublease.); *Bolanos v. Madary,* 609 So.2d 972, 977 (La. App. 4 Cir. 1992), *writ denied,* 615 So.2d 339 (La.1993) (Defendant's letters to government agencies did not fall to level of unethical, oppressive, unscrupulous, or substantially injurious practice and thus, did not constitute unfair trade practice.).

[T]he range of prohibited practices under LUTPA is extremely narrow. In *Turner v. Purina Mills, Inc*., 989 F.2d 1419, 1422 (5th Cir.1993), the court explained:

> LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious. Finally, the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes. [Citations omitted.]

Further, "an intent to eliminate the competition does not by itself violate LUTPA. Rather, the statute forbids businesses to destroy each other through improper *means." Turner*, 989 F.2d at 1423.

Plaintiffs' LUTPA claim against LSR, as presently alleged, suffers the same shortcomings set forth above relative to their claims of negligent and intentional misrepresentation, fraud, and detrimental reliance. With respect to Cargill, Plaintiffs' LUTPA claim is essentially identical to its tortious interference with contract claim against that defendant, which is not actionable

under Louisiana law, because it fails to comport with the narrow confines of the limited tortious interference with contract cause of action established in *9 to 5 Fashions, Inc. v. Spurney,* 538 So. 2d 228 (La. 1989). LUTPA cannot apply to activity that is not otherwise actionable under Louisiana law. See *American Waste and Pollution Control Co., v. Browning-Ferris, Inc*., 949 F.2d 1384, 1386-92 (5th Cir. 1991). Accordingly, on the showing made, Defendants' motions are granted relative to Plaintiffs' claims for relief asserted under LUTPA.

      F.    <u>Tortious Interference with Contract (Claim Eight)</u>

      In Claim Eight of the Amended Complaint, Plaintiffs purport to assert a tortious inference of contract claim against Cargill based on Cargill's alleged interference with the January 3 Verbal Agreement. As an initial matter, Plaintiffs and Cargill disagree whether, under the applicable choice of law provision, this claim is governed by Louisiana or Texas substantive law principles. In this instance, however, the Court does not have to resolve the choice of law question. Because the Court has determined that Plaintiffs have not sufficiently alleged the existence of a binding contract relative to the January 3 Verbal Agreement, they likewise cannot establish a tortious interference claim against Cargill relative to that contract. Accordingly, Cargill's motion to dismiss is granted relative to Claim Eight.

      G.    <u>Tortious Interference with Business Relationship (Claim Nine)</u>

      The tortious interference with business relationship claim that Plaintiffs have asserted against Cargill, however, does require the Court to resolve the choice of law dispute. Although the parties agree that Civil Code article 3543 is determinative of this issue,[39] the parties disagree as to

---

    [39]    Article 3543 provides:

the location of the alleged conduct and alleged injury.  Construing the allegations of Amended

Complaint in Plaintiffs' favor, the Court concludes that Cargill's alleged wrongful conduct – even if

properly characterized as being directed toward Louisiana, by virtue of LSR's Terminal Site being

there – is most appropriately viewed as having occurred in Texas.  In support of this conclusion, the

Court notes that Cargill does not dispute Plaintiffs' contention that Cargill's ETM business

development manager, Gaston Garrido, is based in Houston, Texas, from where he made phone calls

and sent emails regarding the Project, and that he and Goitia, Plaintiffs' sole shareholder and a Texas

domiciliary, twice met at Cargill's Houston office to discuss Cargill's potential role in the Project.

Accordingly, because the tortious interference with business relationship claim permitted by Texas

law "provides for a higher standard of conduct"[40] than the more limited cause of action authorized

---

### Art. 3543.  Issues of conduct and safety

Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.

In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.

The preceding paragraph does not apply to cases in which the conduct that caused the injury occurred in this state and was caused by a person who was domiciled in, or had another significant connection with, this state. These cases are governed by the law of this state.

See La. Civ. Code art. 3543.

[40]      *Id.*

by Louisiana law,[41] the first sentence of Article 3543 dictates the application of Texas law regardless of whether Plaintiffs' injury is alleged to have occurred in Louisiana or Texas.

Under Texas law, "[t]o prevail on a claim for tortious interference with prospective business relations, a plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. See *Coinmach Corp. v. Aspenwood Apartment Corp.,* 417 S.W.3d 909 (Tex. 2013) ((citing *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex.2001) (addressing requirement of predicate tort or unlawful conduct)).  Establishing that defendant's conduct was independently tortious or wrongfu, does not require that the *plaintiff* be able to prove an independent tort. See *Wal–Mart Stores, Inc,* 52 S.W.3d 726. Rather, proof that the defendant's conduct would be actionable (as to someone) under a recognized tort is sufficient. *Id.*[42]

---

[41]    Under Louisiana law, establishing a tortious interference with business relations claim requires proof that the defendant "improperly and maliciously influenced others not to deal with plaintiff." See *Hardy v. Easterling*, 47-950, pp. 11-12 (La. App. 2d Cir. 4/27/13), 113 So.3d 1178, 1186-87. Louisiana jurisprudence has viewed the claim with disfavor and construed the malice element require plaintiffs to show a defendant acted with "actual malice," that is, "spite or ill will, which is difficult (if not impossible) to prove in most commercial cases in which conduct is driven by the profit motive, not by bad feelings." *Id.* (quoting *Bogues v. Louisiana Energy Consultants, LLC*, 46,434 (La. App.2d Cir.08/10/11), 71 So.3d 1128, 1134).  The only motive fairly attributed to Cargill by the allegations of the Amended Complaint is one of profit. Thus, as stated, the allegations set forth in Claim Nine are not sufficient to state a tortious interference with business relations under Louisiana.

[42]    As explained by the *Wal-Mart* court:

On the present showing made, the Court is unable to definitively conclude that Plaintiffs' allegations fail, as a matter of law, to state a claim for interference with business relations under Texas law.  Rather, for the reasons set forth in Plaintiffs' memoranda, it appears plausible,  at this stage of the proceeding, that Cargill's alleged conduct, while favorable to Cargill, could nevertheless breached a fiduciary duty owed to LSR or SUGAR, thus rendering Cargill's conduct independently tortious or unlawful for purposes of Plaintiffs' interference with business relations claim.[43]

H.      Unjust Enrichment (Claim Ten)

As acknowledged by the parties, an unjust enrichment claim asserted under Louisiana or Texas law has five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and resulting impoverishment; (4) an absence of "justification" or "cause" for the enrichment and impoverishment; and (5) the absence of another remedy at law.  See, e.g. *JP Mack*

---

"Thus, for example, a plaintiff may recover for tortious interference from a defendant who makes fraudulent statements about the plaintiff to a third person without proving that the third person was actually defrauded. If, on the other hand, the defendant's statements are not intended to deceive . . ., then they are not actionable. Likewise, a plaintiff may recover for tortious interference from a defendant who threatens a person with physical harm if he does business with the plaintiff. The plaintiff need prove only that the defendant's conduct toward the prospective customer would constitute assault.  Also, a plaintiff could recover for tortious interference by showing an illegal boycott, although a plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful."

See *Wal-Mart*, 52 S. W. 3d at 726.

[43]      See Plaintiffs' Cargill Opp., Sealed Rec. Docs. 16-2, p. 26 of 36 - p. 30 of 36: Plaintiffs' Cargill Surreply, Sealed Rec. Doc. 30, p. 4 of 6 - p. 6 of 6.

*Indus. LLC v. Mosaic Fertilizer, LLC,* 970 F. Supp. 2d 516, 520-21 (E.D. La. 2013).  Given the nature of Plaintiffs' other claims, and the factual scenario involved here, it presently is not apparent to the Court, to any reasonable likelihood, that an unjust enrichment remedy could eventually be established in this matter. Although Plaintiffs have alleged unjust enrichment in the alternative, the "mere fact that a plaintiff does not successfully pursue another available remedy does not give the plaintiff the right to recover under the theory of unjust enrichment."  See *JP Mack Indus. LLC,* 970 F. Supp. 2d at 521.  According, the Court grants Defendants' motions relative to Plaintiffs' unjust enrichment claims (Claim Ten).

## CONCLUSION

As stated herein, **IT IS ORDERED** that Defendants' motions (Rec. Docs. 6 and 8) are **GRANTED IN PART** and **DENIED IN PART**.  **IT IS FURTHER ORDERED** that these rulings are without prejudice to Plaintiffs' right to attempt to cure the identified deficiencies by amendment filed no later twenty (20) days from the entry of this Order and Reasons.  Any such amendment is to be set forth in a second amended and superseding complaint. Lastly, in denying Defendants' motions to dismiss, in part, the Court emphasizes that the instant ruling certainly does not insulate those aspects of Plaintiffs' claims from dismissal by means of a properly supported motion for summary judgment. Rather, the Court rules on Defendants' motions considering the information presently available to it and the principles of law establishing the parameters of the Court's resolution of motions filed pursuant to Rule 12(b)(6).

New Orleans, Louisiana, this 13th day of August 2015.

_____
**KURT D. ENGELHARDT**

**United States District Judge**