UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PEAKER ENERGY GROUP, LLC & <br> ENERGY COAST LOGISTICS TERMINAL, LLC | CIVIL ACTION |
| VERSUS | NO. 14-2106 |
| CARGILL, INCORPORATED & <br> LOUISIANA SUGAR REFINING, LLC | SECTION "N" (3) |

## ORDER AND REASONS

Presently before the Court is "Defendants' Joint Motion for Summary Judgment on Lost-Profits Damages" (Rec. Doc. 265). Having carefully considered the parties' submissions, the record in this matter, and applicable law, **IT IS ORDERED** that Defendants' motion is **GRANTED** to the extent stated herein relative to any damages award for "lost profits" or "lost business value" sought by Plaintiffs Peaker Energy Group., LLC ("Peaker") and Energy Coast Logistics Terminal, LLC ("ECLT") in this matter.

With their motion, Defendants Cargill, Inc. and Sugar Growers and Refiners, Inc. ("SUGAR") argue that Plaintiffs are precluded from recovering damages for "lost profits" in this matter for three different reasons. *First,* Defendants argue that Plaintiffs cannot recover "lost profits" in this case because such damages cannot be proven with reasonable certainty.[1] *Second*, Defendants contend that Plaintiffs cannot show the requisite causation – that Defendants' actions

---

[1] *See* Rec. Doc. 265-1, p. 15.

1

– "as opposed to external forces" – caused Plaintiffs' alleged damages.[2]  *Third*, Defendants maintain that the proper measure of damages is the difference between the cost of obtaining a lease at the LSR site compared to an alternate site, and that Plaintiffs have failed to produce evidence of "what it would have cost them to develop the Project a suitable, alternative location."[3]

In ruling in Defendants' favor relative to the instant motion, the Court does not find it necessary to address Defendants' second and third grounds for their motion.  Instead, the Court focuses solely on Defendants' first contention: that Plaintiffs have failed to put forth evidence sufficient to prove with reasonable certainty that Plaintiffs' venture, but for Defendants' allegedly wrongful conduct, would have been successful and generated profits.  As urged by Defendants, damages are not recoverable for a claim of lost expected profits that is overly speculative or uncertain.  *See, e.g. Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276 (Tex. 1994);  *George W. Garig Transfer v. Harris*, 226 La. 117, 75 So. 2d 28, 33 (1954); s*ee also Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.*, 617 F. App'x 272, 278 (5th Cir. 2015) ("Lost profit damages may not be based on evidence that is speculative, uncertain, contingent, or hypothetical.")

Rather, "[f]or both their tort and their contract claims, to recover damages for lost profits, Plaintiffs must prove with reasonable certainty that [they] would have actually earned [future] profits but for Defendants' conduct."[4]  Thus, to survive summary judgment, Plaintiffs must put forth evidence sufficient to "establish [to a reasonable certainty] that they would have been

---

[2]   *Id.* at pp. 15 and 22.

[3]   *Id.* at p. 23.

[4]   *Id.*

2

successful if only LSR had not [] declined" to lease its site to them.[5]  As stated above, the Court finds that Plaintiffs have not met this burden.

In reaching this decision, the Court focuses primarily on Defendants' contentions regarding: (1) Plaintiffs' status as brand-new business entities, without well-established track records;[6] (2) ECLT's questionable ability to finance the Project, which Matthew Goitia estimated to require $140 million for the first phase and an additional $65 million for the second phase;[7] (3) the undisputed uncertainty of the market spread between the prices of crude oil in Canada and the United States Gulf Coast, and associated costs, both long-term and during the approximately eighteen to twenty months construction would require;[8] (4) the narrowing of the spread by 2016

---

[5]  *Id.*

[6]  Although various individual members of Plaintiffs' teams had several years of prior business experience in crude oil trading, transportation, logistics, and financing, they had never worked together on project like this one. *See* Rec. Doc. 265-1, p. 2.

[7]  *See* Rec. Doc. 265-1, p. 4 (citing Rec. Doc. 265-1, Exh. Q at LSR0000165). The report prepared by one Plaintiffs' expert, Craig McCann, reflects that "ECLT projected it would need between $109 million and $123 million to initially fund the project [and] anticipated that it would need an additional $56.2 million for later capital expenditures." *See* Rec. Doc. 321, Exh. B, pp. 10-11. The report prepared for Plaintiffs by Legacy Capital LLC discusses various models reflecting the necessary capital expenditure for phase 1 to be between $111.5 million and $120.25 million with additional $65.11 million needed for phases 2 and 3. *See* Rec. Doc. 321, Exh. 61, pp. 11-12. It is undisputed that Plaintiffs would have had to acquire these sums from outside sources. Indeed, Defendants report ECLT's bank balance at the end of 2013 to be less than $34,000. *See* Rec. Doc. 265-1, p.4.

[8]  Plaintiffs' Matthew Goitia identified this uncertainty ("price spreads, technology/yield claims, possible market shocks" and "[s]ignificant and a prolonged price compression") in the "Investment Evaluation Document" that he transmitted by email to Scott MacKenzie, Larry Faucheux, and Erdin Guma on January 6, 2014. *See* Rec. Doc. 265-1, Exh. Q at LSR0000165. According to Goitia, the implications of these risks included "default, re-evaluation of contract, etc." *Id.* He identified the "main risk management strategy [to be] secur[ing] firm long-term service contracts for a significant portion of terminal capacity." *Id.*

(when Plaintiffs would have been able to complete the Project);[9] (5) Plaintiffs' roles as the first entities to develop a "true third-party terminal" of the type they envisioned; (6) the uncertainty of the approval by LSR's Board of Directors of a long-term lease agreement between LSR and Plaintiffs; and (7) the uncertainty of securing sufficient "take or pay" customer agreements with five-to-seven year terms.[10] Although any one of these factors, if considered alone, arguably would be of little significance, the combination pushes the speculative and uncertain nature of the success,

---

[9] *See* Rec. Doc. 265-1, p. 19. According to Defendants, the report prepared by Plaintiffs' expert , Eric Smith, reflect that the spread would have dropped to $6.33 in January 2016. *Id.* Further, taking into account estimated transportation, Defendants estimate that Plaintiffs' hypothetical customers would have lost $11.15 per barrel as of that date. *Id.*

[10] *See* Rec. Doc. 265-1 at pp. 15-22. Defendants discuss additional conditions in their memorandum: (1) securing rights to additional necessary neighboring land; (2) obtaining necessary permits and licenses from federal, state, and local regulatory agencies; (3) securing sufficient oil production (five unit trains of oil per week) from Canadian facilities; and (4) securing agreements with necessary railroads for use of tracks. *Id.*

profitability, and value of Plaintiffs' venture far beyond a level upon which an award of damages for lost profits or lost business value[11] may rest.

        New Orleans, Louisiana, this 30th day of December 2016.

                                               **KURT D. ENGELHARDT**
                                               **United States District Judge**

**Clerk to Copy:**

U.S. Magistrate Judge Daniel E. Knowles, III

---

[11] In opposing Defendants' motion, Plaintiffs argue that it must be denied for the additional reason that Plaintiffs are seeking a damages award for the lost business value, as of the time of loss (June 2014), as calculated by their proffered experts, rather than a damage award for lost profits. *See* Rec. Doc. 321, pp. 14-19. On the showing made, the Court disagrees. Specifically, Plaintiffs' reliance on a lost business value measure presents a distinction without a difference, in this particular instance, given that Plaintiffs' experts' lost asset value calculations are premised upon the same or similar assumptions that preclude a lost profits damage award, *e.g.,* the capabilities of Plaintiffs' management team; the securing of more than $100 million in financing for the project's first phase, between January 2014 and June 2014, and more than $50 million thereafter; the LSR Board's ultimate approval of a lease and dock agreement; commencement of construction in June 2014 followed by commencement of actual operations in 2016; the existence of sufficient market conditions to render Plaintiffs' operations successful for a number of years following an assumed commencement of operations in 2016; and the securing of sufficient take-or-pay agreements ("five unit trains per with at an average length of five years") with creditworthy customers. *See* Rec. Doc. 321, Exh. B, at pp. 3-4, 8 and 20; *see also* Rec. Doc. 321, Exh. 61 *passim*.